**ASSOCIATION OF FLIGHT ATTENDANTS–CWA, AFL–CIO, Appellant,**

v.

**UNITED AIR LINES, INC., Appellee.**

**No. 05 C 3172.**

United States District Court, N.D. Illinois, Eastern Division.

July 21, 2005.

Robert S. Clayman, Carmen R. Parcelli, Matthew E. Babcock, Guerrieri, Edmond, Clayman & Bartos, P.C., Washington, DC, Peter Carl Swanson, Robert A. Seltzer, Cornfield & Feldman, Chicago, IL, for Appellant.

Andrew A. Kassof, Adrianne Katrine Jakola, Alexander Dimitrief, Chad John Husnick, David Richard Seligman, James

J. Mazza, Jr., James Howard Mandell Sprayregen, John F. Hagan, Jr., Raymond Christopher Heck, Kirkland & Ellis LLP, United States Trustee, Office of the United States Trustee, Eugene Robert Wedoff, United States Bankruptcy Court, Northern District of Illinois, Kenneth S. Gardner, Clerk U.S. Bankruptcy Court, Chicago, IL, for Appellees.

## MEMORANDUM OPINION

DER–YEGHIAYAN, District Judge.

This matter is before the court on Appellant Association of Flight Attendants–CWA, AFL–CIO's ("AFA") appeal from a bankruptcy judge's ruling in this matter. For the reasons stated below, we affirm the ruling of the bankruptcy court.

## BACKGROUND

On December 9, 2002, Appellee United Air Lines, Inc. ("United") and twenty-seven of its affiliates entered into Chapter 11 bankruptcy. During the bankruptcy proceedings, United filed a motion to reject the collective bargaining agreements with each of the six labor unions that represented United's employees pursuant to Section 1113(c) of the Bankruptcy code ("Section 1113(c)"). 11 U.S.C. § 1113(c). Trial on United's Section 1113(c) motion was set for January 7, 2005. On December 9, 2004, the bankruptcy court allowed the Pension Benefit Guaranty Corporation ("PBGC") to intervene in this action. Before the trial began on January 7, 2005, United agreed to withdraw the Section 1113(c) motion in order to continue negotiations with its employees' unions in an attempt to reach an amicable settlement. On April 11, 2005, United re-filed its Section 1113(c) motion and a trial was set for May 11, 2005. However, on April 22, 2005, before the scheduled trial, United entered into a settlement agreement with PBGC ("Agreement") regarding United's employees' pension plans. The Agreement provided that the Agreement itself was not a unilateral termination of the pension plans by United. The Agreement also provided that PBGC would waive approximately $1.7 billion in real dollar claims against United's estate. The Agreement also provided that United would pay $1.5 billion in securities to PBGC. Finally, the Agreement provided PBGC with a single pre-petition, general, unsecured claim, arising out of the termination of United's underfunded pension plan against United's bankruptcy estate in the amount of $9.8 billion, subject to the objection of other creditors. On May 10, 2005, the bankruptcy judge approved the Agreement despite the objections to the Agreement that were voiced by AFA. AFA now appeals the approval of the Agreement.

## LEGAL STANDARD

■ A federal district court has jurisdiction, pursuant to 28 U.S.C. § 158, to hear appeals from the rulings of a bankruptcy court. On appeal, the district court reviews the factual findings of the bankruptcy court under the clearly erroneous standard and reviews the bankruptcy court's legal findings under the de novo standard. In re A–1 Paving and Contracting, Inc., 116 F.3d 242, 243 (7th Cir.1997).

## DISCUSSION

AFA has brought the instant appeal seeking to alter the bankruptcy judge's ruling, but there are several fundamental flaws underlying all of AFA's arguments on appeal. First of all, the Agreement between PBGC and United did not require PBGC to terminate AFA's pension plan. Secondly, PBGC is not an independent non-governmental party operating in its own interests for profit or other motives. Rather, PBGC is a statutorily created governmental body that is directed by statute.

Finally, AFA complains vehemently about the general unfairness of the Agreement. AFA complains that it was denied its rights and that United violated various statutes and the collective bargaining agreement entered into between AFA and United ("CBA"). However, AFA fails to point to any law that shows that AFA had a right to take part in the formation of the Agreement. AFA fails to point to any statutory provision that was violated by United and AFA fails to point to any portion of the CBA that was violated. As will be explained below, the facts clearly show, as the bankruptcy judge concluded, that PBGC has authority provided to it by Congress to involuntarily terminate the pension plans if it sees fit despite AFA's objections. Based upon AFA's general complaints of unfairness and the lack of substance underlying its arguments, it is clear that AFA's true complaint is about the statutory scheme underlying the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001, *et seq.*, and PBGC. This court, however, is not the proper forum in which to attempt to legislate new statutory law and alter the statutory schemes.

### I. *Termination of Plans*

■ AFA argues that United, by entering into the Agreement, attempted a unilateral modification of the CBA entered into with AFA, "by entering into the settlement agreement with a third party to effect termination of a collectively bargained pension plan." (Appellant Br. 1). First, of all, one significant error underlying AFA's statement and accompanying argument is the continual reference to PBGC as merely a "third party" and a failure to recognize its statutory authority and guidance in its actions. Secondly, AFA has failed to point to any provision in the Agreement that required PBGC to terminate the pension plan covered by the

CBA. AFA's contention that PBGC would not initiate an involuntary termination in the absence of the Agreement is complete speculation on AFA's part and is not supported by the evidence. AFA vehemently asserts that United purchased a termination of the pension plan from PBGC, yet AFA fails to point to any provision in the Agreement that would contractually bind PBGC to terminate the pension plan after its review if PBGC determined that a termination was not appropriate. There is no evidence to suggest that PBGC would not act consistent with its statutory authority and not terminate the pension plan unless such a termination was in accordance with the statutory guidance provided to PBGC. *See Busboom Grain Co., Inc. v. I.C.C.*, 830 F.2d 74, 75 (7th Cir.1987)(stating that "[a] strong presumption of regularity supports any order of an administrative agency . . . ."). PBGC will receive the payment from United regardless of whether the pension plan is eventually terminated by a voluntary termination or involuntary termination. Thus, if PBGC decided not to involuntarily terminate the Agreement, United would then need to pursue voluntary termination motions. United and PBGC have thus acted within the scope of the pertinent statutory authority. Also, since the Agreement does not require a termination of the plan, there was no modification of the CBA between United and AFA.

### II. *Involuntary Termination*

AFA argues that United attempted to voluntarily terminate the pension plans through the Agreement. However, as is explained in detail above, there is no evidence that the Agreement terminated any pension plan. Rather, under the Agreement PBGC agreed that, after the Agreement is approved by the bankruptcy court, PBGC staff would begin termination pro-

ceedings and that "if and when" PBGC decides that the pension plans should be terminated, United and PBGC shall enter into trusteeship agreements regarding the termination of the plans. (Agr. par. 4(a)). PBGC was free to act in accordance with its statutory authority and guidelines and to involuntarily terminate the plans if it deemed it appropriate. Any potential termination that might have occurred after the formation of the Agreement would thus be an involuntary termination under 29 U.S.C. § 1342 ("Section 1342"). Pursuant to Section 1342, PBGC is authorized to "institute proceedings . . . to terminate a plan *whenever* it determines that" certain factors indicate that a termination is appropriate. The factors included under Section 1342 are the following:

> (1) the plan has not met the minimum funding standard required under section 412 of Title 26, or has been notified by the Secretary of the Treasury that a notice of deficiency under section 6212 of Title 26 has been mailed with respect to the tax imposed under section 4971(a) of Title 26,
>
> (2) the plan will be unable to pay benefits when due,
>
> (3) the reportable event described in section 1343(c)(7) of this title has occurred, or
>
> (4) the possible long-run loss of the corporation with respect to the plan may reasonably be expected to increase unreasonably if the plan is not terminated. . . .

29 U.S.C. § 1342(a)(emphasis added). PBGC is thus expressly authorized to involuntarily terminate a plan "whenever" it determines that the above factors indicate that a termination is warranted. Since any termination of the plan after the Agreement would be an involuntary termination, AFA's arguments concerning a voluntary termination such as the contract bar are entirely inapplicable in this instance.

### III. Violation or Circumvention of Section 1113

■ AFA argues that United was able to circumvent Section 1113(c) by entering into the Agreement and thus avoid having to continue to pursue its Section 1113(c) motion. United filed a Section 1113(c) motion in the bankruptcy court in order to seek an approval for rejection of the collective bargaining agreements United had previously entered into with AFA and five other unions. (Appellee Response 5). The provisions set forth in Section 1113(c) state the following:

> The court shall approve an application for rejection of a collective bargaining agreement only if the court finds that—
>
> (1) the trustee has, prior to the hearing, made a proposal that fulfills the requirements of subsection (b)(1);
>
> (2) the authorized representative of the employees has refused to accept such proposal without good cause; and
>
> (3) the balance of the equities clearly favors rejection of such agreement.

11 U.S.C. § 1113(c). While the Section 1113(c) motion was pending in the bankruptcy court, PBGC entered into negotiations with United. Prior to the start of the scheduled trial on United's Section 1113(c) motion, the Agreement between PBGC and United was reached and subsequently approved by the bankruptcy court. After the Agreement was approved by the bankruptcy court, United moved to withdraw its pending Section 1113(c) motion before the bankruptcy court. (AFA App. 1089–1091).

As a result of the bankruptcy court's approval of the Agreement, AFA claims that the Agreement has "subverted" and "nullified" the Section 1113 process by preventing such process to "run its course."

(Appellant Br. 16; Reply 11–12). Specifically, AFA argues that PBGC's negotiations with United were "not lawful" under Section 1113 and that "[b]ut for" the Agreement reached as result of such negotiations, "AFA would have been afforded [the] benefit of the Section 1113 process." (Appellant Br. 18–19; Reply 11–12). AFA's attempt to characterize as unlawful the negotiations between PBGC and United is without support and lacks merit. AFA has failed to point to one provision in the bankruptcy code that would prohibit PBGC from negotiating with United in such a manner. AFA would have this court imply the existence of a provision of Section 1113(c) that Congress did not see fit to include in the section. We shall not do so.

The pension plan between United and AFA was an ERISA sponsored pension plan. While Section 1113(c) of the bankruptcy code does not mention the proposition that PBGC can enter into negotiations with debtors, it certainly does not prohibit it. 11 U.S.C. § 1113(c). Further, 29 U.S.C. § 1367 ("Section 1367") of ERISA, which governs AFA's pension plan, authorizes PBGC to enter into such negotiations with ERISA plan sponsors such as United. Specifically, under Section 1367, PBGC "is authorized to make arrangements with contributing sponsors and members of their controlled groups who are or may become liable under section 1362, 1363, or 1364 of" ERISA. 29 U.S.C. § 1367. In the instant action, it is clear that United was potentially going to be held liable for its ERISA sponsored plan with AFA. Accordingly, PBGC had every right to "make arrangements" and negotiate with United pursuant to Section 1367. 29 U.S.C. § 1367. AFA contends that "United initiated the Section 1113 process, as it was required to, in order to lift the contract bar against plan termination contained in the AFA CBA." (Appellant Br. 16.). However, the fact that the negotiations were fruitful and eventually caused United to withdraw its pending Section 1113(c) motion before the bankruptcy court does not constitute a "subversion" or "nullification" of the Section 1113 process. AFA contends that "United initiated the Section 1113 process, as it was required to, in order to lift the contract bar against plan termination contained in the AFA CBA." (Appellant Br. 16.). Despite AFA's contentions, United was not "required" to ever file a Section 1113(c) motion. (Appellant Br. 16.)(emphasis added). Instead, United decided at that stage of the bankruptcy proceedings to file such a motion. Accordingly, in subsequently withdrawing such a motion, United was not "subverting" or "nullifying" a process it was never required to enter into in the first instance. Since AFA has failed to establish that the negotiations between PBGC and United were unlawful or inconsistent with the provisions set forth in Section 1113(c), AFA's argument that the Agreement reached as a result of such negotiations undermined the Section 1113(c) process is without merit. United chose to bring the Section 1113(c) motion in the bankruptcy proceedings and United subsequently withdrew its motion which it had every right to do.

## IV. Deprivation of AFA's Rights by Third Party Agreement

■ AFA claims that its "exclusion" from participation in the Agreement reached between United and PBGC "deprived" AFA of certain rights. (Appellant Br. 14–16; Reply 9–11). Specifically, AFA argues that the bankruptcy court's approval of the Agreement reached between United and PBGC was inconsistent with the precedent set forth in the Seventh Circuit's decision in *Fogel v. Zell*, 221 F.3d 955, 964 (7th Cir.2000). (Appellant Br. 15–16). In *Fogel*, the Seventh Circuit stated

that "two parties cannot agree to extinguish the claim of a third party not in privity with either of them." *Id.* at 964. AFA argues that in the instant action the bankruptcy court erred in its application of *Fogel* when it approved the Agreement by declining to address "the argument that two parties cannot enter an agreement to extinguish the legal rights of another party in ongoing litigation." (Appellant Br. 14–16). United contends that the bankruptcy court did not err in this regard since the decision in *Fogel* does not prohibit PBGC from "exercising its statutory authority to initiate an ERISA § 1342 termination." (Appellee Br. 27.)

The bankruptcy court, in approving the Agreement, considered the applicability of *Fogel* and stated that *Fogel* "doesn't seem to have anything to do with the situation here." (AFA App. 1058). We agree with the bankruptcy court's conclusion of *Fogel's* inapplicability to the Agreement's approval. *Fogel* stands against the principle of allowing two parties to enter into an agreement "to extinguish the claim of a third party not in privity with either of them." *Fogel,* 221 F.3d at 964. However, the instant action is distinguishable from *Fogel* for several reasons. First of all, it should be noted that in AFA's Appellant Brief and Reply, AFA has failed to point to a particular provision in the Agreement where United and PBGC ever agreed to "extinguish the legal rights of" AFA. *Fogel,* 221 F.3d at 964. Second, irrespective of the Agreement reached between United and PBGC, it is undisputed that PBGC has the statutory authority, with or without the consent of United or AFA, "to institute proceedings to involuntarily terminate" AFA's pension plan under Section 1342. 29 U.S.C. 1341(a)(3). Finally, AFA's rights have in no manner been extinguished by the Agreement, in that, pursuant to 29 U.S.C. § 1303(f), AFA retains the statutory right to bring a claim against

PBGC for actions attributable to any PBGC instituted proceedings adversely affecting AFA. 29 U.S.C. § 1303(f). Since the bankruptcy court's approval of the Agreement did not deprive AFA of its rights and was clearly not in conflict with *Fogel,* AFA's arguments in this regard are without merit.

*V. Five Year Bar on Pension Plans*

■ AFA argues that the provision of the Agreement barring the establishment of a defined benefit plan for five years violated AFA's bargaining rights and status under the Railway Labor Act ("RLA"). However, pursuant to 29 U.S.C. § 1347, PBGC may "take whatever action is necessary and within its power" to restore a terminated plan. 29 U.S.C. § 1347. As part of that authority, the United States Supreme Court has acknowledged PBGC's power to regulate "follow-on" plans instituted after a plan has been terminated. *Pension Ben. Guar. Corp. v. LTV Corp.,* 496 U.S. 633, 651, 110 S.Ct. 2668, 110 L.Ed.2d 579 (1990)(stating that "follow-on plans may tend to frustrate one of the objectives of ERISA that PBGC is supposed to accomplish—the 'continuation and maintenance of voluntary private pension plans.'")(quoting in part 29 U.S.C. § 1302(a)(1)). The Court has acknowledged that "follow-on plans have a tendency to increase PBGC's deficit and increase the insurance premiums all employers must pay, thereby frustrating another related statutory objective—the maintenance of low premiums" and that "[i]n short, PBGC's construction based upon its conclusion that the existence of follow-on plans will lead to more plan terminations and increased PBGC liabilities is 'assuredly a permissible one.'" *Id.* (quoting in part *Sullivan v. Everhart,* 494 U.S. 83, 110 S.Ct. 960, 108 L.Ed.2d 72 (1990)). Thus, in the instant action, PBGC was within its

statutory authority when it sought to bar future pension plans. In addition, AFA has failed to offer more than speculation to show that its future bargaining rights will be affected especially considering that the CBA between AFA and United cannot be amended until 2010. Therefore, we conclude that the bankruptcy judge did not err in approving the provision of the Agreement that contained the five year ban on future plans.

## CONCLUSION

Based on the foregoing analysis, the bankruptcy court's ruling is affirmed.